For the record, Michael Gosler representing appellant Linda Mastro, Mr. Tollefson, who represents the Dorchester, is seated at council table to my right. We both agreed to use up to 10 minutes. I don't know that I'll require all that. My view is that I would reserve or go eight, reserve two. If I don't use all my eight, I'll cede whatever I don't use to Mr. Tollefson. Okay. And then I was envisioning that you would use your eight minutes and then, Mr. Tollefson, you could use your eight minutes and then I would have, is it Mr. Hall? Yes, Your Honor. Respond to both of you or do you want me to split it up? We have various different cases. It's your call. In fact, we have a bus plan against Mr. Gosler as well. Okay. Then maybe we'll go, raise a good point. We'll go with Mr. Gosler and then for eight minutes and then you can respond and then you can have your two minutes. Thank you. Thank you. No, for 10 and he can watch his time. You'll need to watch your time. Yes, Your Honor. May it please the Court, Michael Gosler representing appellant Linda Mastro. There are really two threshold issues involving this appeal that are before this court today. As Your Honors are aware, this is a case that originated out of the bankruptcy court. The case was tried before the Honorable Mark Barreca. Two forms of relief were entered in favor of the bankruptcy trustee against Linda Mastro in that case. A money judgment arising out of several transactions and a turnover order involving two large diamond rings and some other jewelry. Mrs. Mastro appealed that decision to the bankruptcy appellate panel. The trustee exercised its statutory right to have it referred to the district court to consider the appeal. And the district court denied and dismissed the appeal based solely on the fugitive disentitlement doctrine. The district court did not address the merits of the underlying appeal. Was that on the motion of somebody or a sua sponte? Sua sponte, Your Honor. One of the arguments, one of the respondents' arguments in opposition to the appeal was the fugitive disentitlement doctrine. And Judge Rothstein seized on that argument and on the basis of it alone decided that the court should abstain from exercising jurisdiction over the underlying merits and declined to do so. And so I want to deal briefly with the fugitive disentitlement doctrine first. I think the controlling decision on that is the U.S. Supreme Court's decision from 2006 in the Deegan case in which the court basically focused on two factors as to whether or not the doctrine should be invoked. The first is whether at the time of the appeal there's a remedy available to the courts even though the appellant is outside the jurisdiction and not subject personally to jurisdiction of the courts. And the second is whether or not the absence of the appellant from the jurisdiction anywhere impedes or impairs the ability of the appeal to be processed. I think previously case law had focused on other factors including affronts to the dignity of the court and the like and to deferring flight. But I think under the Deegan case really the benchmarks or the lynchpins are whether relief is available even in the absence of the appellant and whether the process can run its course. And as is clear from the pleadings, the jewelry that was the subject of the turnover order had been returned to the United States and is within this district and was within this district at the time the district court denied the appeal. The presence of those assets at that time effectively gave the court full relief. We know that about the rings. Is there any property of Ms. Mastro's that is subject to the bankruptcy court judgment that is neither in the possession of the trustee or within the jurisdiction of the court? Not to my knowledge, and there's certainly nothing in the record to that effect. But what was clear was that the trustee valued the jewelry collection that had been returned to the United States in an amount in excess of $3 million, whereas the money judgment was approximately $995,000, and the turnover of the jewelry was above and beyond that. And so certainly there would be sufficient property within this jurisdiction to recover. The turnover of the assets, if you will, Your Honor, related primarily to the two large rings and the seven items of jewelry that were transferred into the LCY LLC trust. The jewelry that was returned was a collection that vastly exceeded that. There were quite a number of diamonds and other things that were illicit, I believe, in the article about which the court can take judicial notice. But it certainly appears from the information available that there are more than ample assets to fully protect the trustee and give it full recovery based upon the decision of the trial court, if that's affirmed. So the judgment is fully enforceable even if Ms. Mastro remains a fugitive? That's correct. And then the second issue is whether her absence in any way impairs the ability for this court or the district court or this court to decide the appeal, and the answer to that is, of course, no. The briefing has occurred. Her presence is not physically required here either for the district court or this court to decide the appeal. So then the second question is whether this court should consider the underlying merits of the appeal based upon the fact that the district court did not. Counsel for the trustee in the respondent's brief cited this court's decision in Dawson for the proposition that because review is de novo before this court, there's no reason not to deal with the underlying merits. I would simply point out that in Dawson, the district court, in reviewing the decision of the bankruptcy court, did address all of the issues that were before the bankruptcy court. That was not the case here. The only case we've been able to locate that involved a situation where the Circuit Court of Appeals in reviewing a district court decision, sitting in an appellate capacity, is a case out of the 11th Circuit from 1992 called In Re John Morris at 950 F. 2nd, 1531, where there was a subject matter jurisdiction issue which the bankruptcy court decided in favor of jurisdiction. And then the merits of the underlying case involved a claim by the debtor against a housing authority for the refund of a retainage on a construction project. And in that case, the district court found there was no jurisdiction, did not deal with the retainage issue, and the 11th Circuit in footnote 1 basically said because the district court did not rule on the merits of the case, it would be inappropriate for us to do so in this appeal. Well, to me, it could make a difference depending on what the issues on the merits are. Are they here pure issues of law, or they involve some exercise of discretion by the bankruptcy court? It depends on which point, Your Honor. There were really four items or four components of the trial court's decision that were appealed by Mrs. Mastro. Judgment was entered against her in the amount of approximately $99,000 arising out of a purchase of some gold that she was ordered to turn over. The appeal on that is that there was simply no evidence in the record sufficient to meet the trustee's burden of proof on that. Mrs. Mastro had zero to do with that transaction. There's no documents that show she had anything to do with it. And the closest any document has to her involvement in that was the fact that the gold was to be delivered to the Mastro residence for the detention of Mike Mastro. But there's no evidence that Mrs. Mastro was involved. There were two others. There was a Rolls-Royce transaction, which is discussed in our underlying brief. Again, there was no damage. The bottom line is there's no damage to the estate. So the argument on appeal is that there's simply insufficient evidence in the record to support that. The third involved $995,000 that was put into a bank account pre-bankruptcy by Mike Mastro, who controlled and used that account. And Mrs. Mastro wrote checks on that account post-bankruptcy to the tune of a little over $100,000. And we cited the Davenport decision, which actually was a case cited by the trustee for the proposition that her liability should be limited at maximum to the checks that she wrote on the account and her role in post-bankruptcy in dealing with that. And then there's the issue on the community property issue on the rings and whether the prenuptial agreement, and I think this is a mixed question of both law and fact, but the question is whether the Mastros abandoned the prenuptial agreement, which essentially said that any gifts of jewelry pre-marriage and any gifts of jewelry post-marriage would qualify as separate property. And the bankruptcy judge ruled that the Mastros abrogated or abandoned the prenuptial agreement and didn't consider the two large items of jewelry to be separate property. And the argument basically is that under state law they did not abandon it, that they recognized it, and it should be considered separate property. Just one more minute. Is Mrs. Mastro still a fugitive? Yes. Okay, thank you. Yeah, the extradition proceeding was decided by the French tribunal in favor of the Mastros, and they remained residents of France. Thank you. Good morning, Your Honor. May it please the Court, I'm Spencer Hall. I represent James Rigsby, a trustee in the Mastro bankruptcy. The first thing I want to address is a factually inaccurate statement that counsel made, and it is this. The judgment against Mrs. Mastro and the Court's orders against Mrs. Mastro have not been satisfied. The judgment is not satisfied. Mrs. Mastro and her husband were pursued literally across two continents, and many things were recovered, but the things that were recovered were not all the things that Judge Barreca ordered to be turned over both in his pre-judgment orders and in his final judgment that he entered as was confirmed and upheld by Judge Rothstein. It seems like you're saying the judgment's not fully satisfied, but it's partially satisfied. Well, the two rings, the two rings that were defined by Judge Barreca as the big rings were recovered. And what's their value, the two diamond rings you're talking about? No one really knows. One has been sold, and I don't know what the net proceeds were from that, and the other has not been sold, but it's worth considerably less than what was originally thought, I am told, because of some treatment it was subjected to. But in any event, the money judgment that is entered against Mrs. Mastro, the $1.3 million, is independent of the value of the jewels or the rings or the household goods. No matter what the value of the jewelry and the household goods and the rings, she still owes another $1.3 million. And Judge Barreca specifically ordered her to turn over seven very valuable pieces of jewelry that were placed into the L.C.Y. Trust that was formed in Belize shortly before the bankruptcy. All right, now what does all that have to do with the issues before us? Nothing, huh? Well, I think it does in this sense, Your Honor. There's an argument to be made, which Mr. Gosler is making, which is if her fugitive status in no way impairs the ability of this court or the trustee to enforce the judgment, then the fugitive disentitlement doctrine arguably should not apply. And so, in the sense that the judgment remains unsatisfied and the absence of Mrs. Mastro impairs the ability of the trustee to enforce the judgment, that is the criteria that the court should look to to apply that doctrine. Is there anything in the record that her absence impairs the ability of the trustee? In other words, did the district court make some kind of finding on that? No, right? Well, I hesitate because I think that the district court ordered her to appear so she could discuss these things. But I will say that there's no finding beyond that. Your Honor is correct, but there is case law where the courts have recognized that a defendant who flees from supplemental proceedings so that you can't take their depositions, you can't question them about where their assets are, they are impairing the enforcement of the judgment. And we cited the cases in the brief and maybe in the Conforte case. Is the location of the property that you're referring to known? It is not, Your Honor. Does the trustee have property of Ms. Mestros that's not part of the bankruptcy judgment that exceeds the value of the missing property? You can't know the answer to that, Your Honor. The trustee lost, maybe I misunderstood your question.  Because she was ordered to turn over all of her jewelry. And so she was found in Europe with stashes of jewelry nobody was even aware of. We know specific pieces of jewelry weren't in the stashes she was caught with in Europe and we know she continues to live apparently in luxury in Europe from some undisclosed source of funds. But we have not recovered assets that should be applied to the $1.3 million judgment that would even begin to satisfy that judgment. We do know that. And I will say this, the other thing is that the jewelry that was recovered in Europe by the law officials who tracked her there, the FBI and then the European officials, none of that went to the trustee except the two rings because it was forfeited to the U.S. government in a forfeiture proceeding. So it wasn't available to satisfy the judgment against Mastro. But if it had been available, it would not have counted toward the $1.3 million because her obligation to turn that property over was independent of the monetary judgment. In other words, it was in effect cumulative, right? She had to turn over all the property plus she had this $1.3 million in addition to that. That's exactly right, Your Honor. Now what about the merits? If we were to decide, speaking hypothetically, that District Court Judge Rothstein should not have, in this case, invoked the fugitive disentitlement doctrine, should we reach the merits, which apparently the lower court did not, right? The lower court did not. And the lower court didn't say why the lower court didn't do that. The trustee believes you should, and the reason is we think it's judicial efficiency. I would concede you have the discretion, this panel has the discretion to do whatever it wants, but there's an ocean of evidence supporting the judgment. It's a clearly erroneous standard and it would be very wasteful, I suggest, to remand this, have Judge Rothstein look at it. We would undoubtedly have another appeal and then it would be fragmented and one panel wouldn't be considering the whole thing. And you've obviously been required to look at the record in the context of the Dorscher's appeal. Well, but was there any briefing? Was there proper briefing on both sides on the merits? I mean, I think only the trustee briefed the merits. I don't think the other side briefed the merits. Well, the other side declined to put it into their Ninth Circuit brief, but they incorporated their briefs to Judge Rothstein by reference on all the other issues, and that's part of the record. In any event, if the panel has no more questions, I would just say in closing that I think this, if you read all the cases we've cited, the Conforte case in the Ninth Circuit, the Empire Blue, Cross Blue Shield case in New York, this is exactly the kind of case where the Fugitive Disentitlement Doctrine should apply. And in this case in particular, the Mastros and Mrs. Mastro have disregarded the rules from day one. They've never done anything the court told them, and so it would be a very just result. If for any reason the court does not agree with applying that doctrine, and I can't imagine why not, but if that's the case, I would encourage you to go ahead and uphold the decision because it's all factually based and it's clearly a erroneous standard and it would be the most efficient thing to do. Thank you very much. I believe I have one minute left and I have really just two comments to make. At pages six and seven of the appellate's brief, we reference a number of news articles that quote the trustee about the recovery of the jury by the FBI from the French authorities. I think those articles describe the fact that the Mastros were incarcerated and they were put into jail in France. Their apartment was basically completely searched. The keys to safe deposit boxes were located. All the jewelry and assets were returned. There's no evidence there's anything else out there, but more to the point, much more was recovered than what the turnover order dealt with, and that batch of assets should be more than sufficient to cover the satisfaction of the judgment. Counsel commented about a forfeiture proceeding. I don't believe there's anything in the record before this court that deals with that particular issue, and I don't think there's anything that would indicate in this record that there is an insufficient basis for the executed recovery of the judgment. But what if it's unknown? Pardon me? What if it's unknown? I'm sorry? What if it's unknown whether there's any outstanding property out there? Where does that put us? I would suggest that whether there is other property or not is not relevant. If the value of the assets presently available in this district are sufficient to cover the judgment. But counsel says they're not, says there's $1.3 million that's independent that doesn't cover. Well, the turnover order only addressed the two big rings and seven other items. There was significant additional jewelry recovered on top of that, which is available to be executed on for purposes of the judgment, and the trustee's estimate was the total value of those assets was in the $3 million range. $3 million? $3 million range, yes. Thank you. Just a moment, please. Yes. Just assume that we agree with your argument. Yes. What is it you would like us to order in this case? Well, if the court deals with the merits, we would ask that the court. That's part of my question. Do you want us to deal with the merits? Yeah. Mrs. Mastro's view, as indicated in our opening brief, was that the only issue before this court is the issue of the disenfranchisement doctrine. It certainly would avoid another appeal if the court feels it's within its discretion to decide the merits to do so. And so I have no objection, or Mrs. Mastro, I should say, has no objection to the court considering the underlying merits if the court believes that's appropriate. I just felt it was important to raise the issue because it's not entirely clear whether the court has jurisdiction to decide the underlying merits in circumstances where it sits in a reviewing capacity and the lower court never decided the issue in the first instance. Do you have any objection to our ordering the district court in this case to decide the merits? No. Okay. Thank you, Your Honor. Okay. Thank you very much. If you'd like to come forward, Mr. Colson.  I represent the Dorsers. The Dorsers invested, or Mr. Dorsers invested the last of his retirement money with Mike Mastro and was living off the income. He went back to a tried and true borrower that he had used before, but he wanted security. The Friends and Family Program, most of all of them were unsecured. He was unsatisfied with the security. He threatened to call his demand note if he didn't get security. In exchange for not having to return Mr. Dorsers' money, Mastro gave him additional collateral on his house, higher interest rate, and the new note had no right to demand in it. Now, what I want to do is attack seven findings for clear error made by the trial court and the district court. The first one is that the February transaction was a sham transaction designed to defraud Mastro's creditors by making it look as if the Medina residence was encumbered by a $12 million lien. Now, like all of these findings, in fact, there's nothing in the record on this. This is just the speculation of the judges. But the trust deed says it's $12 million or so much as should be dispersed. So any creditor looking at the trust deed is on notice. And besides, this finding makes no sense. If you're ever looking at real property and you see a trust deed for a particular amount of money, you don't know what's owed. You don't know what's been paid on the trust deed unless you inquire of the lender. So, therefore, there's no sham transaction or fraud because of the trust deed. Now, the second finding of fact is that there was no – Let me ask you. Was there a finding of whether or not any money at all has been dispersed under that note? Well, the money had been dispersed in November of 2008 for the friends and family loan. He wanted additional security. So at the closing – this was closed at an escrow with title insurance. And at the closing, the escrow noted that $1.2 million had been paid outside of escrow. And I'm going to cover that in another finding in a moment. I'll show you how the court dealt with that. So what's the answer to my question? There's no evidence that any money at all had been dispersed under the $12 million note? No. In the escrow agreement, it says that $1.2 million had been advanced. The court said that that was wrong. The reason that finding is not correct is the trustee's theory on this is that the Belize Trust and the Lucy LLC, L-C-Y LLC, were alter egos of Mastro. So there's no fraud for Mastro to say, okay, I acknowledge I received $1.2 million so far against this $12 million. The court says that that was evidence of fraud and that there was no money advanced. But that's wrong. The money was advanced. Mastro can say for his alter ego, I received $1.2 million. Actually, the money was sent to a third company. That's not even part of the record. But they were all for Mastro's benefit. The next finding that I want to attack is that there was no intent by the Delaware LLC to encumber the home. Now, there's nothing in the record on this. Mastro didn't testify. This is just a guess by the judge. And what you're looking at here is that, I guess, the intent of the borrower somehow validates the deed of trust. So if a borrower signs the deed of trust in a note and then has a secret intent not to pay it, that somehow that invalidates it? I don't know where that law comes from. The next finding of fact is that Dorsers changed his testimony regarding possession of the February note. That's absolutely false. In the deposition, and when you read the court's ruling, there's no analysis. But as a deposition, Dorsers testified he saw the documents at Hazelrig's house. There's no follow-up question. Well, how did you see the documents? Where were they? Did you pick up a file folder to see what they were? At trial, he said they were on a bureau, and he went over and picked up and held them for a moment and looked at them. That's not inconsistent with seeing them at Hazelrig's place. Then there's a finding that Dorsers said he had no control over Hazelrig, therefore Hazelrig can't be an agent. Well, you're asking a lay witness if he has control over this third party. If Dorsers had put the deed of trust in a safety deposit box with a contract with a bank and was asked, do you have control over this bank, he probably would have said no. But a legal conclusion by a lay person is certainly not grounds for these kinds of findings of fact. The district court said that the receipt of funds was a condition of closing. Well, that was solved by noting on the closing documents that 1.2 had been paid. And then the district court says another finding of fact against Dorsers is that his signature on the request for reconveyance was forged. I don't understand how that hurts Mr. Dorsers. Mr. Mastro gave him inadequate security, in essence cheated him on the first security because he gave him a second that was fully, that had no value. And then there's evidence that there may have been an intent by Mr. Mastro or somebody to reconvey the deed of trust so that Mr. Dorsers would not have his security. How is that a fact against Mr. Dorsers? A couple of other points I'd like to make. We have this idea of further inquiry that's thrown into these kinds of fraud cases. And usually the courts will give us some analysis of what could have been discovered. Occasionally you'll find cases where the courts just throw, well, there should have been more inquiry, and nobody knows what they could have discovered. Now, for some reason, Mr. Dorsers is supposed to do more inquiry before he gets his improved collateral. Well, what could he have done? Talk to Mastro's banks? It's not going to get any information. Call the IRS? Further inquiry is a throwaway argument that should not be used in these kinds of cases. Another point I want to make is that Dorsers was a creditor prior to the transfer of the Medina property to the trust. Therefore, under RCW 19.36.020, that transfer is void to him. If he had gone to a lawyer and the lawyer says, okay, you've got this situation where Mastro's doing something with his property to tie it up in trusts, and he's offering you a security interest. Should you take it? Well, that transfer is void. He can ignore that. He can take that security interest. That's what the statute means. Regardless of whatever games Mastro is playing with his assets, Mr. Dorsers is just a creditor. Changing the subject to delivery. We cited in our brief the Washington statutes or cases on that. The delivery is not an issue. If there's been a recording, there's a presumption of delivery. That's what the cases say. That can only be overcome by clear and convincing evidence. There's been no effort to overcome that presumption. When you argue that constructive delivery occurred, that's what you're arguing? No. You're not arguing? No, no. Constructive delivery, they argue that, well, since they didn't change the interest rate, there's no constructive delivery. So I didn't intend to bring that up. No, this is in our brief, opening brief. There's a case, there's several cases, that hold that if you record it, that's delivery. Of course, that was not jumping up to me. So you're not arguing constructive delivery? Not in front of you right now. It's footnote 8. Is it in your briefs? I mean, I thought I read that you were. Yeah, I'm arguing constructive. But since I have short of time, I want to do my best argument. The best argument is recording is delivery. It's a presumption of delivery that can only be overcome by clear and convincing evidence. The constructive delivery argument, I think, is good, but it's clouded by the fact that the interest rate did not change. I had another question for you. You suggest that Dorsers briefly had actual possession of the February note. The court said he didn't believe it. Right. What do we do about that? Well, I don't think you have to decide that because it's recorded. It's a recorded document. So that's your argument. I just want to make sure I understand. I'm going to rest on that because I can't. The court can disbelieve Mr. Dorsers. And if we don't accept the recorded document is delivery. Well, you've got payments being made. There's intent to, you know, he's honoring an obligation. You know those arguments. I've got several other things with 30 seconds left. Go ahead. Okay. I think what really happened here on this $12 million is that Mastro knew he was in trouble. He wanted a line of credit on his house so that he could, because the Princeton family is going to dry up. As soon as the public knew he couldn't pay, he's not, he lives off this liquidity that he gets from millions from his friends and family. When he stops paying them, he's not going to have a line of credit. So he decided to use the house for a line of credit. Then an involuntary bankruptcy hits him, and he comes up with this plan to do a foreclosure. They hire Karen Cross and try to foreclose the property. Now, what the ultimate plan is, we don't know. But Mr. Dorsers just wanted his money back. He's just a creditor. Thank you. May it please the Court. As counsel noted, Mr. Dorser's argument is totally fact-based. There's really no question of law involved. And the standard for appeal is clearly erroneous. And the appellate courts defer to the trial judge. And if a reasonable person could have concluded the way the trial judge did, the decision stands. I suggest in this case that it's not even close. But today he wants to argue and emphasize that recording his delivery. Apparently he's not focusing on that, I think, for the reasons that maybe you are about to address. But what do you say to the recording his delivery? Well, I guess there's two different documents involved here. One is a promissory note, and one is a deed of trust that's supposed to secure a loan. The deed of trust was recorded. But to my knowledge, a promissory note was never recorded. Deeds of trust are recorded all the time. And you have to look to the debt instrument to see what amount is owing that is secured by the deed of trust. If nothing is owing, the deed of trust isn't balanced. So that argument is just an irrelevancy in our view. I would also say that the argument on the note, the promissory note, was that Mr. Dorsters admitted in his deposition that the note had never been delivered to him. And then when he saw there was a problem with that, he kind of changed his testimony. And Judge Bereke had the benefit of being there and seeing his demeanor and listening as the words came out of his mouth and said, but you know what, one day the note was laying on a side table in the entryway when I was visiting Mr. Hazelrig. And I went over and I looked at it and I saw it. And then I left it laying there because I thought it was better that it stayed with Mr. Hazelrig. And Mr. Hazelrig was Mr. Mastro's bosom buddy, was not an agent of Mr. Dorsters, and that is not delivery in any sense of the word factually. That's not a legal question, it's a factual question. And Judge Bereke made a finding on that. Even if you said the note was delivered, the transaction is still a sham factually. There are two independent factual bases for Judge Bereke's ruling. One is under non-bankruptcy law, one is under bankruptcy law. Under non-bankruptcy law he found the transaction was a sham for a lot of reasons, but the very first was no money was ever advanced on this loan. None. Now what Mr. Dorsters does... I bought that outside of escrow. That's exactly where I was headed, Your Honor. In November of 2008, Mr. Dorsters did lend Mr. Mastro $1.2 million. There was a separate note for that. It was a completely separate transaction. And then in February of 2009, we have the sham transaction. There's a $12 million note. Not one penny was ever advanced on the $12 million note. Judge Bereke, and I know Judge Tashima asked this question, I think, was there a factual finding on this? And there was. Judge Bereke found, if you look at the supplemental excerpt of records 63 to 64, Judge Bereke found that the sham transaction, the $12 million transaction, had nothing to do with the previous transaction in November. That November note stays in effect. It's in effect today. Mr. Dorsters, make a claim on that. There's no problem. It had nothing to do with the $12 million transaction. The note wasn't retired. There was no reference to the note in the $12 million transaction. There was zero money advanced on the sham transaction. And that was a factual finding by Judge Bereke. I think part of me can respond to this. As I understand part of Mr. Tollefson's argument is that the transaction was not for a flat $12 million, but up to $12 million. So it didn't require any advance, current advance, for it to be valid. And, thus, his assertion that the court's finding that it was a sham is just pure speculation. There's no evidence to base it on. Well, I don't want to disagree with your Honor, but I don't think. I'm just trying to paraphrase your opponent's argument. The way I heard it, that's all. I don't think even Mr. Tollefson would go that far. I think Mr. Tollefson would agree that if you don't advance a penny, you don't have a transaction. I think what Mr. Dorsett is trying to do is to go back and say, whoa, this money back in November is the money that was advanced out of escrow. You mean the earlier? The earlier transaction, $1.2 million. So he's saying, you know, if we advance $1.2 million, then maybe we didn't advance the whole $12 million. But it says, you know, as much of that as may be advanced. And if he had advanced a new $1.2 million, or if he had said, we are retiring the note in November, and this is taking the place of that, maybe things would have turned out different on that point. But he didn't. He still got the old note, and the judge made a factual finding. They were completely unrelated. And the judge made a factual finding that zero funds were advanced. Okay? Now, there's a second point here, though. Even if money had been advanced, even if $12 million had been advanced, in bankruptcy court, if something like this is done with actual intent to hinder, delay, or defraud creditors, it is a fraudulent transfer. And that is what was found in this case. And then a person who claims, like Mr. Dorsett, that I was an innocent, I got duped into this, he has a defense. I did this transaction in good faith. And if he can prove that defense, he's protected. But Mr. Dorsett couldn't prove he did this in good faith. There's a laundry list of factual findings by the judge in our brief that says Mr. Dorsett was on notice that this was a phony deal, including execution of documents and backdating them in the middle of the night. That's one of my questions. Does the good faith defense involve a duty to investigate? Yes, Your Honor. And when should Dorsett have known this? He should have known this from the very first. He agreed to escrow. He provided Mr. Mastro with information regarding his bank account in Monaco, from which supposedly $12 million was going to be transferred. And he probably didn't have $1,200. He knew from the start this paper was documenting a transaction that was not occurring and could not occur. And so you can go from there and just trace it right on through. And we've done that in our brief. We've listed about 20 factors. And the worst one is toward the end when he gets a document in the middle of the night in Monaco and Hazel Ridge says, sign this and send it back. We need this to prop up the transaction. He signs it, faxes it back in the middle of the night, and it's backdated back to before the bankruptcy. So all the way through, conduct from the very first day of this transaction to post-bankruptcy, again and again and again there are indicia that would have put anybody on notice, even without reasonable inquiry. I did have a question. If the Medina deed of trust was enforceable and made with the intent to defraud, why would Linda Mastro have sought to buy out Dorser's interest? Well, I don't know, Your Honor. I mean, two things for that on me. One is Mrs. Mastro repeatedly said things during this case that weren't true. So I don't know if she really did make that offer to buy it out. That was the testimony, so I guess we have to assume that's the case. Second, I don't think Mrs. Mastro knows what the law is because if she does, she never followed it. So I just don't know the answer. There's one question, if you have any other questions, I'll answer them. But there's one question you asked, Judge McGeer, that I'd like to respond to, if you would permit me, and it was a procedural question, which is what should the court do if you can't tell, if you don't know if enough money or jewels have been collected to satisfy this judgment? And I suggest there's a very easy answer to that. It happens all the time, which is whether the judgment has been satisfied. It's not really material to whether the judgment should be upheld. If the judgment is upheld, anybody can go into court, back to the district court or the bankruptcy court, and say, I have satisfied this judgment. Here is proof I've satisfied this judgment. Please require the trustee to enter a satisfaction of judgment. That is completely independent of the issue that is before this court. Because you don't have an adequate record to answer that question when people are claiming things back and forth based on newspaper articles. Thank you very much. Thank you. I'll give you one minute. All right, I'll try to speak fast. Mr. Dorsters and Mrs. Manistro both testified about the $900,000, so it's pretty established on the record. I'd like to point out that every 548 case cited by the trustee in this brief, there was an additional factor. The transferee got a value that exceeded what they paid for it. There was hidden profit. I could find no 548 cases that stretched to this kind of case. This is really a preference case. If it had been made within 90 days, then it could have been voided. It's outside the 90 days. There's security. I'm just jumping around because I've got a minute. But on the delivery issue,  Dorsters lives in Europe. Dorsters has a copy in his possession. There's nothing in the record that tells how Dorsters had a copy of the note in his record. The original is kept by Hazelrig. Dorsters said for him. And then we have the constructive and we have the filing as delivery. So I think there's a lot of evidence. The whole point of delivery is, is there intent to be bound? There's no evidence that Manistro didn't intend to be bound or paid Dorsters. When you look back at this whole, I mean, all the things that were said in here, you look at the record. There's little or nothing to support the theories that the trial judge came up with. What we have is Manistro was criminally indicted. Hazelrig was criminally indicted. So they must be bad people. So they must have been doing something bad. But my client just wants his retirement money. All he was trying to do was be secured. He didn't want to be involved in anything with Mr. Manistro. He has no relationship with Mr. Manistro. Thank you. I'd like to thank all counsel for their arguments this morning. It was very helpful. This matter is now submitted and our docket for today has concluded. Thank you. Be in recess.
judges: ALARCON, TASHIMA, MURGUIA